JUDGE ENGELMAYER

Raphael Katz
SADOWSKI KATZ LLP
830 Third Ave, Fifth Floor
New York, NY 10022

*16 CV 6029*

Jack Newhouse
VIRGINIA & AMBINDER, LLP
40 Broad Street, 7th Floor
New York, New York 10004

Attorneys for Relator J. Doe

**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**

*16 CV 6029*

UNITED STATES OF AMERICA and the
STATE OF NEW YORK *ex rel.* J. DOE,

               PLAINTIFFS/RELATOR,

            v.

PUBLIC HEALTH SOLUTIONS,

               DEFENDANT.

**COMPLAINT**
**JURY TRIAL DEMANDED**

**FILED UNDER SEAL**
**AND *IN CAMERA* PURSUANT TO 31**
**U.S.C. § 3730(b)**

Civ. No.

       On behalf of the United States of America ("United States") and the State of New York

("New York"), relator J. Doe ("Relator") files this *qui tam* Complaint against defendant Public

Health Solutions by and through Relator's attorneys, and alleges as follows:

**I.  INTRODUCTION**

      1.     This is a civil action brought by J. Doe, pursuant to 31 U.S.C. § 3730(b)(1) on J.

Doe's own behalf and on the behalf of the State of New York and the United States against

Defendant under the False Claims Act, 31 U.S.C. §§ 3729 *et seq.* (the "False Claims Act") and

N.Y. Fin. Law § 187 *et seq.* (the "New York False Claims Act") to recover damages sustained,

and penalties owed to, the United States and New York as a result of Defendant having knowingly

presented or caused to be presented false claims and statements for the payment of funds disbursed under Medicaid or otherwise by the State and City of New York.

2.      This action involves New York and New York City's Early Intervention program and specifically the provision of coordination services for that program.  Defendant Public Health Solutions, as an approved Early Intervention Service Coordination provider receives Federal, State and City Money to coordinate the various services, such as physical therapy, occupational therapy, and nursing services, provided to children under the age of three who may have developmental delays. In 2014 alone, Public Health Solutions received over three million dollars ($3,000,000.00) in Medicaid funding or reimbursement.

3.      Public Health Solutions engaged in a scheme to maximize the government monies it received while failing to provide the services it billed for.  Specifically, it set high quotas of hours billable to the government for its employees to make, tracking, reviewing, and terminating, them if they fail to meet those numbers.   Employees were also trained to make comprehensive records to cover up Public Health Solutions' fraud and document many more hours of services than were actually provided.   Defendant then unlawfully billed and overbilled Medicaid and the City and State of New York for these services that were never provided.

4.      Relator, aware of the fraud upon the Government, complained to Public Health Solutions superiors about the fraud.  Public Health Solutions terminated Relator in retaliation.

## II.  JURISDICTION AND VENUE

5.      This Court has jurisdiction over the claims brought under the False Claims Act pursuant to 31 U.S.C. § 3730(a), 28 U.S.C. §§ 1331, 1345, and 1367.

6.      Pursuant to 28 U.S.C. § 1331, this District Court has original jurisdiction over the subject matter of this civil action because it arises under the laws of the United States, in particular

the False Claims Act.  In addition, the False Claims Act specifically confers jurisdiction upon the United States District Court.  31 U.S.C. § 3732(b).

7.      Venue lies in this District pursuant to 31 U.S.C. § 3732(a) and 28 U.S.C. §§ 1391(b) and 1391(c), because Defendant do business in this District and because many of the acts complained of herein took place in this District.

8.      This suit is not based upon prior public disclosures of allegations or transactions in a criminal, civil, or administrative hearing, lawsuit, or investigation, or in a Government Accounting Office or Auditor General's report, hearing, audit, or investigation, or from the news media.

9.      Relator has voluntary disclosed the allegations in this complaint to the Government, prior to commencing this action and is an original source of those allegations.

## III.  **PARTIES**

### **Relator J. Doe**

10.      J. Doe brings this action on J. Doe's own behalf, on behalf the United States pursuant to the False Claims Act, and on behalf of the State of New York pursuant to the New York False Claims Act.

### **Plaintiff the United States of America**

11.      The United States of America brings this action on behalf of the Centers for Medicare and Medicaid Services ("CMS").

### **Plaintiff State of New York**

12.      The State of New York brings this action on behalf of its agency the New York Department of Health and the City of New York and its agencies.

### **Defendant Public Health Solutions**

3

13.     Defendant Public Health Solutions is a New York County not-for-profit corporation.

## IV.  **THE LAW**

### **The False Claims Act**

14.     The False Claims Act, as amended, provides, in pertinent part, that:

> [A]ny person who (A) knowingly presents, or causes to be presented a false or fraudulent claim for payment or approval; (B) knowingly makes, uses, or causes to be made or used, a false record or statement material to a false or fraudulent claim . . . (G) knowingly makes, uses, or causes to be made or used, a false record or statement material to an obligation to pay or transmit money or property to the Government, or knowingly conceals or knowingly and improperly avoids or decreases an obligation to pay or transmit money or property to the Government, is liable to the United States Government for a civil penalty of not less than [$5,500] and not more than [$11,000]... plus 3 times the amount of damages which the Government sustains because of the act of that person. 31 U.S.C. 3729(a)(1)(A), (B), (C) and (G) (violations occurring after September 29, 1999 are subject to fines of $5,5000 to $11,000, *see* 28 C.F.R. § 853.(a)(9)(2014)).

31 U.S.C. § 3729(a)(1)(A),(B), and (G).

15.     A claim is defined as "any request or demand, whether under a contract or otherwise, for money or property and whether or not the United States has title to the money or property," that "is presented to an officer, employee, or agent of the United States" or:

> [I]s made to a contractor, grantee, or other recipient, if the money or property is to be spent or used on the Government's behalf or to advance a Government program or interest, and if the United States Government –
>
> > (I) provides or has provided any portion of the money or property requested or demanded; or
> >
> > (II) will reimburse such contractor, grantee, or other recipient for any portion of the money or property which is requested or demanded;

31 U.S.C. § 3729(b)(2)(A)(i)-(ii).

16.     A statement or claim is material if it has a "natural tendency to influence, or be capable of influencing, the payment or receipt of money or property." *Id.* at § 3729(b)(4).

17.     A claim for services not provided, for services not reasonable and necessary, or for worthless services is not reimbursable and may violate the False Claims Act.

18.     Similarly, a claim for services that violates a condition of payment violates the False Claims Act.

### The New York False Claims Act

19.     The New York False Claims Act provides, in pertinent part, that:

> Any person who (a) knowingly presents, or causes to be presented a false or fraudulent claim for payment or approval; (b) knowingly makes, uses, or causes to be made or used, a false record or statement material to a false or fraudulent claim; . . . (g) knowingly makes, uses, or causes to be made or used, a false record or statement material to an obligation to pay or transmit money or property to the state or a local government; or (h) knowingly conceals or knowingly and improperly avoids or decreases an obligation to pay or transmit money or property to the state or a local government, or conspires to do the same; shall be liable to the state or a local government, as applicable, for a civil penalty of not less than six thousand dollars and not more than twelve thousand dollars, plus three times the amount of all damages, including consequential damages, which the state or local government sustains because of the act of that person.

N.Y. State Fin. Law § 189(1)(a), (b), (c), (g), and (h).

20.     The New York False Claims Act defines claim and materiality the same as the False Claims Act, except that claims are defined as claims to the State or Local Government, and not the Federal Government. *Id.* at § 188(1) and (5).

21.     Conduct that violates the False Claims Act will also violate the New York False Claims Act where New York funds are implicated.

**Medicaid**

22.     Medicaid is a joint Federal-State program created in 1965 that provides health care benefits for eligible beneficiaries, primarily the poor and disabled.  The Federal portion of each State's Medicaid payments, known as the Federal Medical Assistance Percentage ("FMAP"), is based on the State's *per capita* income compared to the national average.  *See* 42 U.S.C. § 1396d(b).  Among the States, FMAP is at least 50 percent.  The States pay the remaining portion of the cost to provide benefits under the Medicaid program. At the Federal level, Medicaid is administered by CMS.  Medicaid is used by the States, each of which has a State Medicaid agency to administer the program.

23.     Medicaid relies upon certified provider agreements such as CMS-855-A and CMS-8551, hospital cost reports such as CMS-2552, and claim forms such as CMS-1450 and CMS-1500.  CMS and State Medicaid programs condition payment of claims on health care providers' compliance with Federal and State law.

**New York Medicaid – Conditions of Payment**

24.     In order to be reimbursed by Medicaid, services must be necessary, appropriate, consistent with quality of care and acceptable practices, and must not be excessive.  18 NYCRR §§ 500.1, 500.3, 518.1, and 518.3; *see New York State Medicaid Program Information for all Providers – General Policy*, NEW YORK STATE DEPARTMENT OF HEALTH, at 23-25, Oct. 20, 2011, https://www.emedny.org/providermanuals/allproviders/pdfs/information_for_all_providers-general_policy.pdf.

25.     Unacceptable practices include, but are not limited to, offering or paying for kickbacks in exchange for referrals for medical services, failing to keep or make available

pertinent records for audits or investigations, and failing to comply with New York and Federal rules and regulations. 18 NYCRR § 515.2(1), (3), (4), (5), (6), and (15).

26. Medicaid billing requires providers, such as Public Health, to bill through a series of current procedure terminology codes ("CPT codes"). CPT codes identify the services rendered and the amount to be paid to the provider.

27. By enrolling as a provider, the provider certifies:

> (f) to submit claims on officially authorized claims forms in the matter specified by the department in conformance with the standards and procedures for claims submission; . . . (h) that the information provided in relation to any claim for payment shall be true, accurate, and complete; and (i) to comply with the rules, regulations and official directives of the department.

18 NYCRR § 504.3(f), (h), and (i).

28. To the extent a provider wished to continue submitting claims form year to year it is required to execute the Medicaid certification on an annual basis.

### New York Early Intervention Program and Service Coordination

29. The EI program in New York state (and other states) originated from the Individual with Disabilities in Education Act, where Congress identified the need "to enhance the development of infants and toddlers with disabilities [] and to minimize their potential for developmental delay." 20. U.S.C. 1431(a)(1). Congress therefore established a framework for the Government to provide financial assistance to States to provide EI. 20. U.S. C. 1431(b)(1).

30. The New York Department of Health is the lead agency for promulgating rules and regulations for the administration of the New York EI program. N.Y. Health L. 2452, 2559-b.

31. New York established a legal frame work for funding EI services, whereby coverage should first be sought from private insurers and then from Medicaid. Costs not covered by either are the shared financial responsibility of the State and the relevant municipality.

32.     EI service coordination was established to help developmentally disabled children get the care they need.  As the Director of the Early Intervention Program stated:

> Early intervention service coordination combines the traditional case management activities of organizing and coordinating needed services with the philosophy of family centered care. A major goal of service coordination is to create opportunities for the provision of collaborative, family-centered, community-based services for infants and toddlers with disabilities and their families. Service coordinators help families identify and prioritize concerns, assist parents in developing of plans and strategies to meet the needs of their children and family units, and strengthen families' competencies and sense of control over life events.

Letter to Early Intervention Officials from Donna M. Noyes, Early Intervention Program Director, 1 (January, 2000) *available at* https://www.health.ny.gov/guidance/oph/cch/bei/94-4.pdf.

33.     However, before a service coordinator can bill for services for an eligible child, service coordinators must seek approval to bill for reimbursement from the Department of Health for initial and ongoing services under Article 25 of the Public Health Law.  10 NYCRR 69.4.30.

34.     10 NYCRR 69.4.30(c)(3) explains how a service coordinator can bill Medicaid.

> *Service coordination* as defined in section 69-4.1(k)(2)(xi) of this Subpart. Service coordination shall be provided by appropriate qualified personnel and billed in 15 minute units that reflect the time spent providing services in accordance with sections 69-4.6 and 69-4.7 of this Subpart, or billed under a capitation methodology as may be established by the commissioner subject to the approval of the Director of the Budget. When units of time are billed, the first unit shall reflect the initial five to 15 minutes of service provided and each unit thereafter shall reflect up to an additional 15 minutes of service provided. Except for child/family interviews to make assessments and plans, contacts for service coordination need not be face-to-face encounters; they may include contacts with service providers or a child's parent, caregiver, daycare worker or other similar collateral contacts, in fulfillment of the child's IFSP.

35.     The standards for initial and ongoing service coordinators described in 10 NYCRR 69-4.6 include:

> (a) All agencies and individuals approved to provide early intervention service coordination shall fulfill those functions and activities necessary to assist and

8

enable an eligible infant and toddler and parent to receive the rights, procedural safeguards and services that are authorized to be provided under State and Federal law, including other services not required under the Early Intervention Program, but for which the family may be eligible.

> (1) Each eligible infant and toddler and their family shall be provided with one service coordinator who shall be responsible for:
>> (i) coordinating all services across agency lines; and
>> (ii) serving as the single point of contract in helping parents to obtain the services and/or assistance they need.

(b) Service coordination shall be an active ongoing process that involves:

> (1) assisting parents of eligible infants and toddlers in gaining access to the early intervention services and other services identified in the individualized family service plan;
> (2) ensuring the individualized family service plan outcomes and strategies reflect the family's priorities, concerns and resources, and that changes are made as the family's priorities, concerns and resources change;
> (3) coordinating the provision of early intervention services and other services (such as medical services for other than diagnostic and evaluation purposes) that the infant or toddler needs or is receiving;
> (4) facilitating the timely delivery of available services; and
> (5) continuously seeking the appropriate services and situations necessary to benefit the development of the child for the duration of the child's eligibility.

(c) Specific service coordination activities shall include:

> (1) coordinating the performance of evaluations and assessments;
> (2) facilitating and participating in the development, review and evaluation of individualized family service plans;
> (3) assisting families in identifying available service providers;
> (4) coordinating and monitoring the delivery of services;
> (5) informing families of the availability of advocacy services;
> (6) coordinating with medical and health care providers, including a referral to appropriate primary health care providers as needed; and
> (7) facilitating the development of a transition plan to preschool services if appropriate or to other available supports and services.

(d) Initial and ongoing service coordinators shall obtain, and parents shall supply, any information and documentation necessary to establish, and update periodically upon the request of the early intervention official, an eligible child's third party payor coverage, and the nature and extent of such coverage, including coverage through the medical assistance program, other State governmental insurance or benefit program, and/or other plan of insurance, and promptly transmit such information and documentation to the early intervention official.

36. Initial service coordinators duties described in 10 NYCRR 69-4.7 include:

(a) Upon referral to the early intervention official of a child thought to be an eligible child, the early intervention official shall promptly designate an initial service coordinator, selecting whenever appropriate a service coordinator who has an established relationship with the child or family, and shall promptly notify the parent of such designation in writing.

(1) Upon receipt of the referral, the early intervention official shall mail parents' handbook to the parent by mail or other suitable means.

(2) For children in care and custody or custody and guardianship of the local social services commissioner, the early intervention official shall notify the local commissioner of social services or designee of the designation of an initial service coordinator.

(b) The initial service coordinator shall promptly arrange a contact with the parent in a time, place and manner reasonably convenient for the parent and consistent with applicable timeliness requirements.

(c) The initial service coordinator shall inform the parent of their rights and entitlement under the Early Intervention Program and shall document the information provided in the child's record.

(1) At the initial contact with the parent, the initial service coordinator shall ensure the parent has a copy of the Early Intervention Program parents' handbook, review the handbook, provide an overview of the early intervention system and services, discuss the role of the initial service coordinator, and review the parent's rights, responsibilities and entitlements under the program.

(d) The initial service coordinator shall ascertain if the child and family are presently receiving case management services or other services from public or private agencies. If so, the initial service coordinator shall discuss options for collaboration with the parent and, if appropriate, obtain consent for the release of information for the purpose of collaboration with other case management services.

(e) All information provided to the parent shall be in the parent's dominant language or other mode of communication unless clearly not feasible to do so.

(f) All information obtained from the parent shall be confidential and may only be disclosed upon written consent, unless otherwise required or permitted to be disclosed by law.

(g) The initial service coordinator shall inform the family that services must be at no cost to parents and use of Medicaid and/or third-party insurance for payment of services is required under the Early Intervention Program.

(1) The service coordinator shall inform the parent that any deductible or co-payments will be paid by the municipality.

(2) The service coordinator shall inform the parent that use of third-party insurance for payment of early intervention services will not be applied against lifetime or annual limits specified in their insurance policy, if such policy is subject to New York State law and regulation.

(3) The service coordinator shall inform the parent that the municipality will not obtain payment from their insurer if the insurer is not prohibited

from applying, and will apply, payment for early intervention services to the annual and lifetime limits specified in their insurance policy.

(h) The initial service coordinator must obtain, and parents must provide, information about the status of the family's third-party insurance coverage and Medicaid status and promptly notify the early intervention official of such status, including:

(1) Medicaid enrollment status and identification number, if any;

(2) type of health insurance policy or health benefits plan, name of insurer or plan administrator, and policy or plan identification number;

(3) type of coverage extended to the family by the policy; and

(4) such additional information necessary for reimbursement.

(i) The service coordinator shall assist the parent in identifying and applying for benefit programs for which the family may be eligible, including:

(1) the Medical Assistance Program;

(2) Supplemental Social Security Income Program;

(3) Physically Handicapped Children's Program;

(4) Child Health Plus; and

(5) Social Security Disability Income.

(j) The initial service coordinator shall review all options for evaluation and screening with the parent from the list of approved evaluators including location, types of evaluations performed, and settings for evaluations (*e.g.,* home *vs.* evaluation agency). Upon selection of an evaluator by the parent, the initial service coordinator shall ascertain from the parent any needs the parent may have in accessing the evaluation.

(k) The initial service coordinator shall at the parent's request assist the parent in arrangement of the evaluation after the parent selects from the list of approved evaluators.

(l) If the parent has accessed an approved evaluator prior to contact by the initial service coordinator, the initial service coordinator shall contact the parent to assure that the parent has received information concerning alternative approved evaluators and ascertain from the parent any needs the parent may have in accessing the evaluation.

(m) Upon receipt of the results of the evaluation, the initial service coordinator may with the approval of the early intervention official and with parental consent, require additional diagnostic information regarding the condition of the child, provided that such information is not unnecessarily duplicative or invasive to the child according to guidelines of the department of Health.

(1) Prior to obtaining written consent for additional diagnostic information, the initial service coordinator shall provide the parent with a written explanation which shall include:

(i) diagnostic information requested;

(ii) reasons for obtaining the information, and use of the information;

(iii) location of diagnostic testing;

11

(iv) source of payment and that no costs shall be incurred by the parent;

(v) a statement that the information shall not be used to refute eligibility; and

(vi) a statement that the meeting to formulate the individualized family service plan shall be held within the 45 day time limit.

(2) The initial service coordinator shall assist the parent in accessing the diagnostic testing as needed and desired by the parent.

(3) The initial service coordinator shall facilitate the parent understanding of the results of the diagnostic information, and with parent consent, incorporate this diagnostic information into the planning and formulation of the individualized family service plan.

(n) Upon the determination of a child as ineligible for early intervention services, the initial service coordinator shall inform the parent of the right to due process procedures as set forth in this Subpart.

(1) The initial service coordinator shall inform the parent of other services which the parent may choose to access and for which the child may be eligible and offer assistance with appropriate referrals.

(o) Upon determination of the child's eligibility for the Early Intervention Program, the initial service coordinator shall discuss the individualized family service plan process with the parent and shall inform the parent:

(1) of the required participants in the individualized family service plan meeting and the parent's option to invite other parties;

(2) that the initial service coordinator may invite other participants, provided that the service coordinator obtains the parent's consent and explains the purpose of this person's participation;

(3) that inclusion of family assessment information is optional;

(4) that their priorities, concerns and resources shall play a major role in the establishment of outcomes and strategies among the parent, evaluator, service coordinator and early intervention official;

(5) of the opportunity to select an ongoing service coordinator, who may be different from the initial service coordinator, at the individualized family service plan meeting or at any other time after the formulation of the individualized family service plan;

(6) that the final decisions about the services to be provided to the child will be made by the parent and the early intervention official; and

(7) that services can be delivered in a range of settings such as an approved provider's facility, as well as a variety of natural environments, including the child's home, child care site or other community settings.

(p) The initial service coordinator shall assist the parent in preparing for the meeting to develop the individualized family service plan, including facilitating their understanding of the child's multidisciplinary evaluation and identifying their resources, priorities, and concerns related to their child's development.

> (1) The initial service coordinator shall discuss with the parent the options for early intervention services and facilitate the parent's investigation of various options as requested by the parent.

37.    Only certain services are eligible to be reimbursed.  Service coordination is required

to be provided by appropriate qualified personnel as defined in 10 NYCRR 69-4.4:

> Billable activities include verbal or face-to-face contacts with a child's biological and/or surrogate parents, foster care caseworkers, service providers, caregivers, child care providers, or other collateral contacts, as necessary, to assist the family to develop, implement and monitor the child's IFSP, and to assist the family with all activities related to the transition of their child out of the EIP, effective April 1, 2013. Face-to-face contacts can occur anywhere, including the child's residence, community setting, or a facility.

New York State Department of Health Bureau of Early Intervention, "Billing for Initial an Ongoing Service Coordination Activities for Early Intervention Program" at 2, (December, 2013), *available*                                    *at*                                    2, https://www.health.ny.gov/community/infants_children/early_intervention/docs/billable_initial_ and_ongoing_service_coordination_activities.pdf.

38.    However "[a]ll activities conducted by the service coordinator, whether billable or

not, must be recorded in the child's record." *Id.*

39.    Finally, "The [Bureau of Early Intervention] Department follows all Medicaid

requirements concerning documentation and billing."

## V.    **THE FACTS**

### **Fraudulent Billing and Services Not Provided**

40.    Public Health Solutions ("Public Health") is a domestic not for profit corporation

located at 40 Worth Street, New York, NY 10013.  Public Health has been in operation since 1957.

Until approximately December 2007, Public Health operated under the name Medical and Health

Research Association of New York City, Inc.

41.     From at least 2006, Public Health entered into a contracts with New York City in to provide Early Intervention Service Coordination ("EISC") services. They also enrolled in Medicaid. Therefore, it was receiving payments from New York State and New York City as well as from the Federal Government to provide EI coordination services.

42.     Public Health apparently realized quickly that it could not justify the expenses of a staff of EISC service coordinators without unlawfully maximizing the amount of money it billed to the Government, and the State and City of New York.

43.     Public Health management, including but not limited to Tracy LeBright, the Director of Public Health's EISC Program, implemented policies and practices that institutionalized a culture of unlawful overbilling.

44.     Public Health required its service coordinators employed for five months or more to bill at least twenty-three (23) units per day or 430 units per month. One billable unit is equal to fifteen (15) minutes. The first unit can be billed starting at the fifth (5) minute.  As a result, to bill twenty-three (23) units in a day, requires approximately five-and-a-half (5.5) hours of billable work.

45.     By tracking each fifteen minute unit of time billed by each employee, Public Health's billing practices were specifically tailored to correspond to Medicaid's billing requirements.

46.     Public Health evaluated its employees based on how much billable time they entered each month. Public Health management's quarterly and annual reviews of its service coordinator included specific tracking and evaluation of billable units.

47.    In fact, until at least November 2012, one of the standardized categories on Public Health's Annual Performance Review Summary for service coordinators was: "Maintains 5½ to 6 hours per day of active service coordination."

48.    Failure to meet the target would lead to reprisals including termination. Conversely, meeting the billable target was rewarded with a 3% raise.

49.    At the start of Relator's employment with Public Health in approximately May 2006, Relator was told that failure to meet the minimum billing requirement each month would result in termination. During Relator's employment, Relator's supervisors, including Ms. LeBright, Guadalupe Azcona, Gisell Caberado, Christine Delgado, Indra Singh, and Seanon Capino, each informed Relator and the other service coordinators under their supervision that failure to meet the monthly minimum billing requirement would result in termination.

50.    Since January 2015, numerous individuals were terminated or forced to resign as a result of not meeting the minimum billing requirement. These individuals include, but are not limited to: Geraldina, Laura Diaz, Joel Cabrera, Joel Hilario, Daisy Gonzalez, Norilinda, and Myra.  Many others were also terminated or forced to resign prior to 2015.

51.    One service coordinator, Dora Owusu, refused to add time to a prior bill, per the instruction of Ms. LeBright.  Ms. Owusu was fired in August 2015 for not meeting her billable target.  When Ms. Owusu applied for unemployment, she was informed that Public Health challenged her entitlement on the grounds that she was terminated for fraudulently overbilling.

52.    The minimum billing requirement of twenty-three (23) units per day or 430 units per month was also unreasonably high and impossible to meet without fabricating billing notes.

53.    Billable time primarily consists of telephonic or face-to-face meetings with clients, Individual Family Service Plan ("IFSP") meetings with city officials from the Department of Health and the client, and meetings between the Board of Education and the client.

54.    Face-to-face meetings with clients could include in-office or out-of-office meetings. At the initial meeting with a client, the service coordinator is tasked with obtaining consent from the client for a child's evaluation process. This initial meeting typically takes fifteen (15) to twenty (20) minutes. On rare occasions, the meeting will take up to thirty-five (35) minutes.

55.    After the child is evaluated, if the child is deemed eligible for services, the service coordinator coordinates an IFSP meeting between the client and city officials from the Department of Health. Setting up this meeting typically requires a telephonic conversation with an official at the Department of Health that takes no more than a few minutes. The service coordinator will attend this meeting, which typically takes twenty (20) to twenty-five (25) minutes. On rare occasions, when the child requires substantial services, these meetings can take approximately an hour.

56.    If the child is deemed ineligible for services, the service coordinator is tasked with obtaining the clients signature for closure on the case file. This meeting typically takes under ten (10) minutes, as it only requires obtaining a signature from the client.

57.    Similarly, for children transitioning out of Early Intervention services, the service coordinator is responsible for obtaining consent from the client to refer the child to the Board of Education to be evaluated for services. This meeting takes no more than ten (10) minutes. After the child is evaluated, at the request of the client, the service coordinator would also attend the meeting between the client and the Board of Education. These meetings take approximately fifteen (15) to twenty-five (25) minutes.

58.     Service coordinators at Public Health normally had approximately four to five meetings each day.  Two to three in the office, and one to two out of the office.

59.     There was also a substantial amount of non-billable work that needed to be performed, including, but not limited to: (i) travel time to and from each out-of-office location; (ii) failed attempts to contact parents; (iii) waiting for parents to show up for meetings; (iv) photocopying and faxing; (v) preparing consent forms and closure forms for clients before going to meet them; (vi) scanning the completed signed consent forms and uploading them to the Department of Health system after client meetings; (vii) calling the Department of Health to let them know the forms have been uploaded; (ix) updating client files; (x) drafting billing notes in iClaims or iCentral (the billing software); (xi) attending supervision meetings; and (xii) attending trainings or conferences.

60.     It was unrealistic for the service coordinators to meet their daily or monthly billable targets without fabricating billable work.

61.     To increase billing, Public Health service coordinators were instructed by their supervisors and management, including Ms. Caberado, Ms. Azcona, Ms. Delgado, and Ms. LeBright, to stop doing phone meetings, and only schedule face-to-face meetings, even if face-to-face meetings were not necessary.

62.     For example, when obtaining signatures from clients on the closure forms, service coordinators could easily have called the client to discuss the form, then mail the form to the client for execution.  However, Ms. LeBright, Gisell, Ms. Azcona, Ms. Singh, and Ms. Capino instructed Relator and the other service coordinators to obtain closure signatures through face-to-face meetings in order to justify increased billing.  In fact, in Relator's supervision notes from March

2015, Relator's supervisor, Ms. Singh, wrote as a reminder to Relator that "post eval[uation] discussion should occur face to face unless parent cannot meet face to face."

63.     Similarly, to increase billing, Ms. LeBright and Relator's supervisors instructed Relator and the service coordinators to tell parents that service coordinators are required to be present at Board of Education meetings, when it is really the client's choice.

64.     In addition to mandating unnecessary billing activities, Public Health service coordinators were also forced to overbill to meet their quotas and taught how to fabricate billing records so the records appear credible. For instance, even though a face-to-face meeting to obtain a closure signature normally takes less than ten (10) minutes, Public Health service coordinators would represent that they met with the client for an hour or two.  Ms. Azcona and Ms. Caberado trained the service coordinators to write in their notes that they spent the time discussing and explaining the evaluation with the client, in addition to directing the client to other public services, even though the service coordinators did not perform these tasks.

65.     Service Coordinators were forced to bill one to two hours for initial face-to-face meetings that normally takes fifteen (15) to twenty (20) minutes.

66.     Service coordinators were forced to bill one to two hours for IFSP meetings that normally take twenty (20) to twenty-five (25) minutes.

67.     Service coordinators were forced to bill at least one unit (at least six minutes) for telephone calls with clients or with the Department of Health, even if the call took less than six minutes.

68.     Service coordinators would record that they spoke with the client's physician or referral source for two billing units (at least sixteen minutes) when they never called the physician at all.

69.     The descriptions entered into the billing notes of the tasks performed by service coordinators during face-to-face or telephone conversation were drafted based on boilerplate templates without regard for what actually occurred at these meetings.

70.     This practice and culture of overbilling has been in place from at least 2006. When Relator started working for Public Health, Relator was taught by her first supervisor, Gisell Caberado, and numerous senior service coordinators, including Patricia White, Letisha Simmons, Candelaria Zerdejo, Lidia Santana, Aura Marte, and Safiatou Abdulia, how to overbill and write the billing note to justify the amount billed.

71.     Specifically, employees were provided with a series of old case files that contained examples of how to enter billings for different tasks, such as initial client meetings, IFSP meetings, and day to day phone calls with clients, providers, physicians, and referral sources. Supervisors and senior coordinators, such as Ms. Caberado and Ms. Azcona, would instruct the new coordinators that to meet the billing requirement, and keep from being terminated, coordinators' entries had to mimic the entries from the sample billing notes in number of units billed and services provided regardless of whether they worked that many units or performed the tasks.

72.     Patricia White, Candelaria Zerdejo, Lidia Santana, and Letisha Simmons were all forced to resign from Public Health for not meeting the minimum billable requirement.

73.     Starting in or about 2008 and continuing through 2015, Ms. LeBright and Relator's supervisors, Ms. Azcona, Ms. Singh, and Ms. Capino, instructed Relator to assist in the mentoring of new service coordinators, and specifically on how to bill. Some of the service coordinators Relator mentored include, but are not limited to, Melissa, Dora Owuso, Catherine, Bianca Baptiste, Ricardo, Natu Die, Christine, Erica, Denise Pena, Myra, Kendra Khan, and Allyson Peralta.

74.     New service coordinators who Relator mentored were trained in the exact same manner as Relator. Specifically, Public Health supervisors would provide the new service coordinator with a sampling of old case files to use as examples. The new service coordinator would quickly learn that the service coordination job responsibilities would take far less time than was stated in the sample case files. The new service coordinators would then approach the Relator who would explain the ongoing practice at Public Health of copying the billing templates in order to meet the minimum billing requirement.

75.     Public Health would periodically do spot checks of the bills entered by its service coordinators.  An individual named Paula would send notes back to supervisors if the billable amount appears unrealistic based on the description in the billing note. Public Health's supervisors, including Ms. Azcona and Ms. Delgado, would then instruct service coordinators, including Relator, to add facts to the billing note to make it appear more believable.  Sometimes Relator was asked to add facts to her note two to three weeks after the note was originally written.  Relator recalls Ms. Azcona and Ms. Delgado assisting her in providing ideas as to additional facts to include, such as, discussions with clients that never actually occurred.

76.     Public Health's policy and practice of overbilling was not limited to Relator's office in the Bronx but occurred on Public Health's office throughout New York City

77.     By linking the unreasonably high minimum billing requirement to a service coordinator's job security, Public Health institutionalized a practice of overbilling.

78.     Public Health's practice of overbilling is organized and longstanding, as it has been in place from at least 2006 when Relator was hired.

79.     Public Health management and supervisors, including Ms. LeBright, Guadalupe Azcona, Gisell Caberado, Christine Delgado, Indra Singh, and Seanan Capino, were well aware

that the billing records were false. Nevertheless, Public Health knowingly billed for services not provided violating the False Claims Act. Additionally, to the extent the any of the services billed were actually provided, Public Health overbilled for many more hours of services than were actually provided. Also, Public Health knowingly kept fabricated records in support of their false bills, a further violation of the False Claims Act.

## RETALIATION

80.     Relator began employment with Public Health in or around May 2006 as a service coordinator.

81.     After coming to Public Health, Relator was trained and informed by Public Health to fabricate billing records to justify billing for services never provided. Further, Relator was given quotas that could only be met through this fabrication.

82.     In the beginning of September 2015, Relator decided to no longer fabricate or falsify billing records and objected to this practice. Rather than billing at least 23 units per day, Relator would bill anywhere from one (1) or two (2) to fifteen (15) units each day.

83.     On September 16, 2015, after nearly ten (10) years of positive evaluations, Relator was accused by Ms. LeBright of documenting that Relator met with a client without actually meeting that client. Ms. LeBright claimed that this is what the client had represented directly to Ms. LeBright.

84.     This client, however, had a documented memory problem. Relator even got a city official named Gabrielle Oriol to meet Relator's supervisor to say that the client had memory issues and that Ms. LeBright cannot rely on the client's representation.

85.     Shortly thereafter, Ms. LeBright accused Relator of not meeting with a different client that Relator documented meeting with. Ms. LeBright again claimed that this is based on

what the client represented directly to Ms. LeBright. This client, however, did not have a working phone number and was transferred to a different agency, so it was impossible for Ms. LeBright to have actually spoken to the client.

86.    On October 19, 2015, Relator had a meeting with Marylyn Green (Relator's supervisor at the time), Ms. LeBright, Tom Salvo, and Brittany (Mr. Salvo's assistant). At the meeting, Mr. Salvo terminated Relator for having "inconsistent" notes.

87.    Relator had been fabricating billings for nearly a decade at the direction of Public Health's management and supervisors. During this time, Relator's actions had only been met with praise and reward.

88.    Two weeks after Relator stopped fabricating billing notes, Ms. LeBright started to aggressively search for "inconsistencies" in Relator's record in a bald attempt to fabricate a non-discriminatory reason for terminating Relator.

89.    It is apparent that Relator was terminated for refusing to continue perpetrating Public Health's fraud and for her objections to it.

## VI.    CONCLUSION

90.    The Government and State of New York implemented early intervention to give children the care and support they need to grow, develop, and ready to take on the world. Public Health Solutions viewed these children only as profit centers, used unlawful quotas to force employees to overbill and to bill for services not provided, as well as to falsify all supporting records, in violation of the False Claims Act and the New York False Claims Act.

## FIRST CLAIM

Violations of the Federal False Claims Act
(31 U.S.C. § 3729 (a)(1)(A))
Presenting False Claims for Payment

91.     Relator incorporates by reference the paragraphs above as if fully set forth herein.

92.     Relator seeks relief against Defendant under Section 3729(a)(1)(A) of the False

Claims Act, 31 U.S.C. § 3729(a)(1)(A).

93.     Defendant knowingly presented, or caused to be presented, false or fraudulent

claims for payment or approval in connection with receiving payment from Medicaid, the State

of New York, and the City of New York

94.     The United States paid such false or fraudulent claims because of Defendant's

acts and conduct.

95.     By reason of Defendant's false claims, the United States, New York State, and

New York City have been damaged in a substantial amount to be determined at trial.

## SECOND CLAIM

Violations of the Federal False Claims Act
(31 U.S.C. § 3729 (a)(1)(B))
Use of False Statements

96.     Relator incorporates by reference the paragraphs above as if fully set forth herein.

97.     Relator seeks relief against Defendant under Section § 3729(a)(1)(B) of the False

Claims Act, 31 U.S.C. 3729(a)(1)(B).

98.     Defendant knowingly made, used, or caused to be made or used, false or

fraudulent records or statements material to a false or fraudulent claim in connection with

receiving payment from Medicaid, the State of New York, and the City of New York.

99.     The United States paid such false or fraudulent claims because of Defendant's acts and conduct.

100.    By reason of Defendant's false claims, the United States, the State of New York, and the City of New York have been damaged in a substantial amount to be determined at trial.

## THIRD CLAIM

Violations of the Federal False Claims Act
(31 U.S.C. § 3729 (a)(1)(G))
Use of False Statements

101.        Relator incorporates by reference the paragraphs above as if fully set forth

herein.

102.    Relator seeks relief against Defendant under Section § 3729(1)(G) of the False Claims Act, 31 U.S.C. § 3729(a)(1)(G).

103.    Defendant knowingly made, used, or caused to be made or used, false records or statements material to an obligation to pay or transmit money or property to the Government, the State of New Yok, and the City of New York, or knowingly concealed or knowingly and improperly avoided or decreased an obligation to pay or transmit money or property to the them.

104.    Defendant failed to pay or transmit money due to the United States, the State of New York, and the City of New York because of Defendant acts and conduct.

105.    By reason of the Defendant's use of false statements, the United States, the State of New York, and the City of New York, have been damaged in a substantial amount to be determined at trial.

## FOURTH CLAIM

Violations of the New York State False Claims Act
(N.Y. State Fin. Law § 189 (1)(a))
Presenting False Claims For Payment

106.        Relator incorporates by reference the paragraphs above as if fully set forth

herein.

107.    Relator seeks relief against Defendant under Section 189 (1)(a) of the New York

False Claims Act, NY State Finance Law § 189 (1)(a).

108.    Defendant, knowingly or acting with deliberate ignorance or with reckless

disregard for the truth, presented, or caused to be presented, to an officer, employee or agent of

the State of New York or City of New York, false and fraudulent claims for payment or approval

in connection with receiving payments.

109.    The State of New York and City of New York paid Defendant under the

Medicaid Program and under the State and City Early Intervention programs because of

Defendant's fraudulent conduct.

110.    By reason of Defendant's conduct, the State of New York and the City of New

York have been damaged in a substantial amount to be determined at trial.

## FIFTH CLAIM

Violations of the New York State False Claims Act
(N.Y. State Fin. Law § 189 (1)(b))
Use of False Statements

111.        Relator incorporates by reference the paragraphs above as if fully set forth

herein.

112.    Relator seeks relief against Defendant under Section 189 (1)(b) of the New York

False Claims Act, N.Y. State Fin. Law § 189 (1)(b).

113.    Defendant, knowingly or acting in deliberate ignorance or in reckless disregard for the truth, made, used, or caused to be made and used, false records and statements, in order to get false or fraudulent claims paid or approved by the State of New York and City of New York.

114.    The State of New York and the City of New York paid Defendant because of its fraudulent conduct.

115.    By reason of Defendant's conduct, the State of New York and City of New York have been damaged in a substantial amount to be determined at trial.

**SIXTH CLAIM**

Violations of the New York State False Claims Act
(N.Y. State Fin. Law § 189 (1)(g))
Use of False Statements

116.    Relator incorporates by reference the paragraphs above as if fully set forth herein.

117.    Relator seeks relief against Defendant under Section 189 (1)(g) of the New York False Claims Act, N.Y. State Fin. Law § 189 (1)(g).

118.    . Defendant, knowingly or acting in deliberate ignorance or in reckless disregard for the truth, made, used, and caused to be made and used, false records and statements, in order to conceal, avoid, or decrease the obligation to pay or transmit money or property to the State of New York and City of New York.

119.    Defendant failed to pay or transmit money due to the State of New York and City of New York because of Defendant's acts and conduct.

120.    By reason of Defendant's acts and conduct, the State of New York and City of New York have been damaged in a substantial amount to be determined at trial.

## SEVENTH CLAIM

Violations of the Federal False Claims Act
(31 U.S.C. § 3730 (h))
Retaliation

121.     Relator incorporates by reference the paragraphs above as if fully set forth

herein.

122.    Defendant violated Section § 3730(h) of the False Claims Act, 31 U.S.C. §

3730(h).

123.    Defendant intentionally retaliated against Relator by discharging Relator and

withholding pay.

124.    Such conduct by Defendant was due to their actions taken in furtherance of this

action, and Defendant had actual and constructive knowledge of such actions.

125.    Such conduct by Defendant has damaged Relator in a substantial amount,

including but not limited to personal hardship and economic loss, in an amount to be determined

at trial.

## EIGHTH CLAIM

Violations of the New York State False Claims Act
(N.Y. State Fin. Law § 191)
Retaliation

126.     Relator incorporates by reference the paragraphs above as if fully set forth

herein.

127.    Defendant violated Section 191 of the New York False Claims Act, N.Y. State

Fin. Law § 191.

128.     Defendant has intentionally retaliated against Relator by terminating

Relator.

129.   Such conduct by Defendant was due to their actions taken in furtherance of this

action, and Defendant had actual and constructive knowledge of such actions.

130.   Such conduct by Defendant has damaged Relator in a substantial amount,

including but not limited to personal hardship and economic loss, in an amount to be determined

at trial.

WHEREFORE, The United States and the State of New York *ex rel.* J. Doe request that

judgment be entered in their favor and against Defendant as follows:

a)   On the First, Second and Third Claims for Relief (Violations of the False Claims

Act, 31 U.S.C. § 3729(a)(1)(A), (B) and (G), for treble the United States' damages, in an amount

to be determined at trial, and an $11,000 penalty for each and every false or fraudulent claim,

record or statement made, used, presented or caused to be made, used or presented by Defendant;

and

b)   Awarding Relator the Relator's Share pursuant to 31 U.S.C. § 3730(d)(1) or (2);

and

c)   On the First, Second, and Third Claims for Relief, an award of costs and

attorney's fees pursuant to 31 U.S.C. § 3730(d); and

d)   On the Fourth, Fifth and Sixth Claims for relief (Violations of the New York

False Claims Act, N.Y. State Fin. Law § 189(1)(a), (b), and (g), for treble the State of New York's

damages, in an amount to be determined at trial, plus a $12,000 penalty for each false claim; and

e)   Awarding Relators the Relator's share pursuant to NY State Finance Law §

190(6); and

    f)   On the Fourth, Fifth, and Sixth Claims for Relief, an award of costs and

attorney's fees pursuant to N.Y. State Fin. Law § 190(7); and

    g)   On the Seventh and Eighth Claims for Relief (Violations of the False Claims Act,

31 U.S.C. § 3730(h) and of the New York False Claims Act, N.Y. State Fin. Law § 191 awarding

Relator two times back pay and interest on the back pay and all special damages sustained as a

result of the discrimination including but not limited to litigation costs and reasonable attorneys'

fees; and

    h)   Awarding any further relief this Court deems proper.

**JURY TRIAL IS DEMANDED.**

Dated: New York, New York
July 27, 2016

SADOWSKI KATZ LLP

By: _____
Raphael Katz, Esq.
830 Third Ave, Fifth Floor
New York, NY 10022
Telephone: 646-503-5341
Facsimile:  646-503-5348
rkatz@sadowskikatz.com

VIRGINIA & AMBINDER LLP

Jack Newhouse, Esq.
40 Broad Street, 7th Floor
New York, New York 10004
Telephone: 212-943-9080
Facsimile: 212-943-9082
jnewhouse@vandallp.com

TO:

United States Attorney for the
Southern District of New York
86 Chambers Street / 3rd Floor
New York City, NY 10007

Attorney General
Civil Division
United States Department of Justice
950 Pennsylvania Avenue, NW
Washington, D.C. 20530-0001

New York State Attorney General
Medicaid Fraud Control Unit
120 Broadway, 13th Floor
New York, New York 10271